245 F.2d 633
 WESTERN OIL & FUEL COMPANY, a Delaware Corporation, Appellant,
v.
Orval L. KEMP, Webb Oil Company of Duluth, a Minnesota
corporation, and Lake Superior Refining Company, a
Wisconsin corporation, Appellees.
Orval L. KEMP, Webb Oil Company of Duluth, a Minnesota
corporation, and Lake Superior Refining Company, a
Wisconsin corporation, Appellants,
v.
WESTERN OIL & FUEL COMPANY, a Delaware corporation, Appellee.
 Nos. 15622, 15623.
 United States Court of Appeals Eighth Circuit.
 June 25, 1957.
 
 Daniel H. Mundt, Duluth, Minn. (Thomas M. McCabe and McCabe, Van Evera, Donovan & Mundt, Duluth, Minn., on the brief), for Western Oil & Fuel Co.
 Ray G. Palmer, Duluth, Minn. (Palmer, Hood, Crassweller & McCarthy, Duluth, Minn., on the brief), for Orval L. Kemp and others.
 Before JOHNSEN, VOGEL and VAN OOSTERHOUT, Circuit Judges.
 VOGEL, Circuit Judge.
 
 
 1
 Western Oil and Fuel Company, plaintiff, instituted this action against Orval L. Kemp and Marian J. Kemp, his wife, doing business as Webb Oil Company of Duluth, for breach of contracts and Webb Oil Company of Duluth, a Minnesota corporation, and Lake Superior Refining Company, a Wisconsin corporation, for inducing the breach of and interfering with the same contracts. The case was tried in the United States District Court for the District of Minnesota before the court without a jury. Memorandum decision, findings of fact and conclusions of law were issued wherein the action was dismissed as to Marian J. Kemp and the plaintiff had judgment against the remaining defendants. Excepting for the fact that no question appears as to the propriety of the dismissal of the action as to Marian J. Kemp, all parties appealed, so that here all are appellants as well as appellees. For clarity, then, the parties, when not referred to by name, shall be designated as plaintiff and defendants.
 
 
 2
 A detailed statement of the facts is essential to an understanding of the problems involved. For some years Kemp and one Harry K. Webb were business partners operating under the name of Webb Oil Company of Duluth. Webb desired to sell his interests and Kemp wished to buy. In March, 1953, Kemp contracted the plaintiff, Western Oil, his long-time supplier of petroleum products, for the purposes of obtaining a loan to purchase Webb's interest in the partnership. Western Oil was not in the business of loaning money, but was greatly interested in retaining Kemp's business and becoming his exclusive supplier of petroleum products. Western Oil ultimately agreed to a loan of $103,000 to Kemp so that Kemp could buy out Webb and become sole owner of the partnership. In addition to executing certain notes and mortgages as security for the loan, Kemp agreed with Western that he would purchase for seven years a specified quantity of gasoline and fuel oil at posted price on specified terms. Three such purchasing agreements for seven years beginning on June 30, 1953, were executed. Excepting for amounts and types of products involved, the agreements are identical.[1] These agreements had a provision for cancellation by either party on the second or any subsequent anniversary of the contracts, provided that the buyer, Webb Oil, had paid all its indebtedness of every kind and description owed to the seller. The notes, which went hand in hand with the other instruments, contained the provision:
 
 
 3
 'Makers reserve the right, on the second anniversary date or any subsequent anniversary date hereof, to prepay this note in full. Makers will give thirty (30) days written notice of their intent to exercise this right.'
 
 
 4
 Thus, what we have is a mutually advantageous and promising arrangement whereby Kemp received the necessary funds to buy out his partner and gained a dependable source of supply for his business and Western in return gained a sure and substantial customer for its products.
 
 
 5
 The agreement to lend money and sell products by Western Oil and the agreement by Kemp to buy the products were, as found by the trial court, interdependent.
 
 
 6
 All proceeded well between the parties until the fall of 1953 when Kemp became uneasy over growing competition, the high cost of staying in business and the need to expand. He suggested to Western Oil that he sell out to them and go to work in a managerial capacity. Talks were had between Kemp and representatives of Western but no final understanding was reached. Kemp then began negotiations with a competitor of Western Oil's, Lake Superior Refining Company. These negotiations culminated in a contract on March 11, 1954, between Superior and Kemp whereby Kemp agreed to organize a Minnesota corporation to be known as the Webb Oil Company of Duluth. Superior agreed to buy into the newly organized corporation to the extent of 80% of its stock. Kemp was to own 20%. It was further agreed that Kemp was to be employed as general manager of the new corporation at a salary of $12,000 a year for a term of five years with additional compensation in the form of bonuses, the amount defendant upon earnings of the corporation. In was provided in the original contract that an exclusive purchasing agreement was to be executed between Webb Oil and Superior, whereby Webb Oil was to purchase all of its products from Superior. Such exclusive purchasing agreement was never executed but Webb Oil did purchase all its products from Superior after August, 1954, as originally intended. Purchases from Western by Webb Oil began to decrease after May 8, 1954, and of course ceased altogether when Superior became Webb Oil's sole supplier.
 
 
 7
 This action was started by Western on December 3, 1954. On May 25, 1955, subsequent to the commencement of the action, Kemp and Webb Oil, the corporation, without admitting the validity of the purchasing agreements, notified Western Oil of their intention to pay all indebtedness due Western Oil on the second anniversary of the agreements, June 30, 1955, and gave notice of intention to cancel in accordance with the provisions therefor in the purchasing agreements. All indebtedness owing from Kemp to Western was paid on the second anniversary of the purchasing agreements, June 30, 1955. The trial court made lengthy and detailed findings of fact. Among them, the court found, in substance, that the agreements to loan money and sell petroleum products by Western and the agreements to purchase these products by Kemp and the other covenants between the parties were interdependent; that Kemp, owning an established business, had the implied obligation to continue it in the usual manner until the contracts were cancelled and his indebtedness paid; that Kemp never ceased to have petroleum requirements; that Kemp's negotiations with Superior were at all times a continuing and conscious subterfuge by which he could breach his contracts with Western; that he did not act in good faith; that failure to purchase his requirements from Western breached the June 30, 1953, agreements; and that both Webb Oil and Superior intentionally induced the breach of contracts.
 
 
 8
 In finding for the plaintiff against all defendants excepting Marian J. Kemp, the trial court held that the measure of damages was to be determined by the liquidated damage provision of the purchase agreements (see Footnote No. 1) and that as the purchase contracts were cancelled and simultaneously all indebtedness paid to Western, the damages resulting from the breach were to be limited to damages occurring up to June 30, 1955. At 1/4 cent per gallon, the court awarded plaintiff $15,161.64, found to be the damage resulting naturally and proximately from the breach of contracts.
 
 
 9
 Disposition of this case must be made with reference to the law of the State of Minnesota. Erie Railroad v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.
 
 
 10
 On defendants' appeal, they would have us first determine that there was no breach of contract by Kemp because the petroleum purchase agreements with Western were what are commonly called 'requirement contracts'. Under requirement contracts, a buyer does not breach his contract when requirements for supplies diminish or when he ceases to have requirements by reason of his going out of business. It is true that Kemp's need for fuel from Western diminished, but it was for a reason not within accepted standards of business conduct. Kemp did not cease doing business in good faith; indeed, he did not cease doing business at all except in a most technical sense. The court specifically found that his petroleum requirements never ceased. There was not a good-faith cessation as most cases require. Webb Oil's express purpose was to destroy Western's contracts with Kemp and enter into an exclusive purchasing contract with Superior. Kemp merely used Webb Oil as his new alter ego, but it was clearly 'business as usual'. Where a contract such as these is made between business men it is pre-supposed that there will be a continuance of the well-established business. Pittsburgh Plate Glass Co. v. Paine & Nixon Co., 1931, 182 Minn. 159, 234 N.W. 453, 457. Certainly it was tacitly understood that Kemp would continue in his business, at least for a period of two years and until his indebtedness was paid off. Taking minimal standards of conduct in requirement contract cases which only impose an obligation to act in good faith, Kemp has failed to satisfy these standards. See In re United Cigar Stores Co. of America, 1934, 2 Cir., 72 F.2d 673, 675.
 
 
 11
 Defendants' other allegations of error relate to findings of fact and conclusions of law; specifically findings of fact No. 25, No. 27, No. 28 and No. 29 and conclusions of law No. 4, No. 7 and No. 8.
 
 
 12
 Finding of fact No. 25 and conclusion of law No. 4 determined that Kemp did not cease business in good faith and that he breached his purchase contracts. Findings of fact No. 27, No. 28 and No. 29 and conclusions of law No. 7 and No. 8 are to the effect that Superior and Webb Oil induced the breach of contracts by Kemp with resulting damage to Western. After careful consideration of the record and the briefs and arguments of defendants' counsel, we are left with the firm impression that there was substantial evidence upon which the court could properly base the findings challenged and that the conclusions reached are proper. It would serve no purpose to relate the extensive testimony. Suffice it to say that within the limited scope of review as prescribed by Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A., we cannot say that the court's findings were clearly erroneous. Meier & Pohlmann Furniture Co. v. Gibbons, 8 Cir., 1956, 233 F.2d 296, 300. Defendants point to no reversible error on their appeal.
 
 
 13
 Western's appeal is concerned solely with the law of damages. All other findings and conclusions of the trial court were favorable to Western. The trial court awarded damages in a sum computed in accordance with the liquidated damages clause of the purchase contracts. The court held that Kemp had the right to cancel the contracts upon their second or any subsequent anniversary date by complying with the terms, even though the contracts had been breached prior thereto. Accordingly, damages were limited to the period ending at the second anniversary of the contracts, that is, June 30, 1955.
 
 
 14
 Western's first contention is that under Minnesota law the rights of the parties are immediately and completely fixed upon the breach of a contract and that nothing that either party might later do could affect those rights so as to increase or diminish them. What Kemp did, of course, was to exercise his option to cancel some months after the breach had occurred. If Western's view of the law of Minnesota is correct, it would mean that the defendants could not have cancelled the contracts because the contracts were already extinguished, including the right to cancel. In terms of damage, that would mean that the full term of the contracts still remaining at the time of the breach (approximately six years) was the time measure and not, as the court found, only the time left before the option to cancel could be exercised. Western admits that had Kemp elected to cancel before he breached he would have been liable only for the limited period in which he could exercise his option to cancel. Since Kemp breached and then cancelled, Western argues that the cancellation came too late.
 
 
 15
 Western relies mainly upon Swanson v. Andrus, 1901, 83 Minn. 505, 86 N.W. 465, as announcing the law of the State of Minnesota. The trial court did not mention Swanson v. Andrus in its opinion, indicating that that case was distinguished from the one at issue and accordingly not controlling. We think the trial court was correct. In Swanson v. Andrus, the defendant agreed to plaintiff's proposal for the reconstruction of a building. Plaintiff's proposal as accepted, included the stipulation that he would, at page 465 of 86 N.W., '* * * build any additional partitions for 10 cts. per sq. ft., and any additional floors for 18 cents per sq. Ft.'. Plaintiff commenced preparations for the reconstruction, whereupon the defendant ordered him out of the building and refused to allow him to perform his part of the agreement. Thereafter the defendant let the work to other parties and subsequently decided to add two additional stories to the building. Plaintiff sued for the money expended by him in preparation and profits on the work specifically mentioned in his proposal. In addition thereto, however, he also asked for profits which he might have made if he had been allowed to build the additional stories which defendant added to his plans after he had breached his contract with plaintiff. The Supreme Court of Minnesota held that plaintiff was not entitled to recover damages based upon the construction of the floors which defendant decided to add after he had breached his contract with the plaintiff. In so holding, the court said, at page 466 of 86 N.W.:
 
 
 16
 'The breach was total. True, he had no legal right to do so, but he could and did do it, and the law could not compel him to permit the plaintiff to do the work. But the law compensates him for the loss of his contract by way of damages, and his right to them became fixed immediately upon the repudiation of the contract by the defendant. No subsequent act of the defendant could increase or diminish them. If thereafter he concluded not to build at all, or to omit the fireproofing, or to construct the building strictly in accordance with the original plans, it could not affect the plaintiff's claim for damages, for he had the right to recover for the loss of profits on the work he had a legal right to do at the time of the breach of the contract, and for none other. If this action had been tried before the defendant had decided to enlarge the building and fireproof the whole of it and let the contract therefor, it could not, in reason have been claimed that the plaintiff could recover profits on any work except that specifically designated in the contract, for, as suggested, his rights were fixed at the time of its breach, and the defendant was then under no legal obligations to have any additional work done.'
 
 
 17
 The contract there was dissimilar to the one with which we are here concerned. The contract there under consideration had no provision for cancellation and there plaintiff did recover for admitted breach of that contract insofar as and to the extent that he recovered all that was due at the time of breach. The additional stories were not decided on until after the defendant had breached the contract. Insofar as the additional work was concerned, there was merely plaintiff's offer to do that work at the price mentioned. It was an offer which, up to the time of the breach, had not been accepted or acted upon by the defendant. We do not consider the case in point. Regardless of that, as we shall subsequently demonstrate, a more recent pronouncement of the Minnesota Supreme Court would seem to be controlling.
 
 
 18
 The able trial judge stated in his opinion:
 
 
 19
 'The contract between Kemp and Western was cancelled by notice and the payment of all indebtedness to Western was made on the second anniversary date. Plaintiff contends that Kemp having repudiated his obligation, he cannot thereafter exercise an election at the end of the second year so as to relieve him of damages for breach of contract during the remainder of the seven years. Plaintiff cites Grace and Co. vs. Luckenbach Steamship Co., D.Ct. E.D. Va., 258 F. 49, and Prudential Ins. Co. vs. Faulkner, 10 Cir., 68 F.2d 676, 94 A.L.R. 1160. But both these cases are readily distinguishable because there the time during which defendant had the right to elect had elapsed before the election was made. Here, the right to pay up the indebtedness to Western and be relieved of any contract to take petroleum products from Western on the second anniversary of the contract had not elapsed. The breach of contract to purchase petroleum products did not permit plaintiff to refuse the tender of the payment of Kemp's indebtedness and with the tender and Western's acceptance of the payment of all Kemp's indebtedness, it necessarily must follow that Kemp's obligation to purchase any petroleum products ceased on the second anniversary date. There is no provision in the contract that if Kemp failed to take any part or all of his requirements, the option to cancel would cease. Here, we have a contract which plaintiff characterizes as one which has interdependent provisions with reference to the loan of money and the reciprocal duty of Kemp to purchase from Western his entire petroleum requirements. The parties obviously intended that when the indebtedness was paid, the corresponding duty to purchase would cease at the option of the Buyer. Adequate liquidated damages were provided if Kemp failed to take his requirements as stipulated. The clear intent of the parties, therefore, was to provide the purchaser with the right to exercise his option to cancel on the second anniversary or on any subsequent anniversary date thereafter. It must be emphasized that Kemp never permitted the option to lapse. The recognition of Kemp's right to be relieved of any requirements under the contract upon payment of his indebtedness is clearly consistent with the intention of the parties.
 
 
 20
 'Moreover, whether one considers this contract as an alternative contract or as a contract containing a provision for cancellation at a certain date makes no difference so far as Kemp's right to cancel is concerned. The principle applicable in either situation is the same. Where an alternative contract is being discussed the courts have established the rule that the measure of damages for the breach of an alternative contract, where no election has been made by the defaulting party having the power of election, is that alternative resulting in the lesser recovery. Ach vs. Herman A. Strauss, Inc., 67 Ohio App. 452, 37 N.E.2d 99; W. J. Holliday and Co. vs. Highland Iron & Steel Co., 43 Ind.App. 342, 87 N.E. 249; Branhill Realty Co. vs. Montgomery Ward & Co., 2 Cir., 60 F.2d 922; Godwin vs. Graham, 360 Mo. 418, 228 S.W.2d 789. Williston on Contracts, Vol. 5, Section 1407. And where the contract contains a provision for cancellation upon notice the rule is that the measure of damages for breach is the value of the contract at the date of the breach, but in fixing that value one must consider the length of time the contract is assured of legal life. In other words, the measure of damages is based on the expectancy value of the contract. In Re Petroleum Carriers Co., D.C.Minn., 121 F.Supp. 520. The Court's conclusion is that Kemp clearly had the right to cancel the contract upon its second anniversary date by complying with its terms even though the contract had been breached prior to that date.'
 
 
 21
 Substantial support for the trial court's views with reference to the law of Minnesota is found in the opinion of the late Honorable Matthew M. Joyce, United States District Judge for the District of Minnesota, in In re Petroleum Carriers Co., 1954, 121 F.Supp. 520, 525. There Judge Joyce, applying the law of Minnesota as he found it, held that where a contract, containing a provision giving either party the right to terminate upon fifteen days' notice in writing, was breached by termination without notice, plaintiff's damages were limited to loss of earnings for fifteen days. After summarizing cases from other jurisdictions, Judge Joyce stated, at page 526:
 
 
 22
 'While this is a question of Minnesota law upon which Minnesota decisions would be controlling, there does not appear to be any clearcut decision here. But the case of Pappas v. Stark, 123 Minn. 81, 142 N.W. 1046, suggests that Minnesota would adopt a rule restricting damages in a case such as this.'
 
 Judge Joyce concluded, at page 527:
 
 23
 'It appears on the basis of the above cases that the weight of authority is to the effect that where a contract contains a provision for termination upon notice, recovery of future profits upon breach is limited to the period of the notice term specified.'
 
 
 24
 The Minnesota case of Pappas v. Stark, 1913, 123 Minn. 81, 142 N.W. 1046, relied on by Judge Joyce, was an action for damages for alleged breach of contract. The Minnesota Supreme Court stated therein, at page 1048 of 142 N.W.:
 
 
 25
 'We find nothing in the record that warrants us in holding as a matter of law that defendant ever gave plaintiff the notice required by the contract. It therefore follows that the jury would have been justified in finding that the eviction of plaintiff on January 2d was a breach of the contract, and that plaintiff was entitled to recover his actual damages caused by such breach.
 
 
 26
 'There was evidence that would justify a recovery of more than nominal damages. It occurs to us that the recovery for loss of profits would necessarily be limited to the month of January 1912. Defendant had the right to cancel the contract by giving 30 days' notice. What occurred on January 2d would seem to be sufficient notice of defendant's intention to terminate the relation.' (Emphasis supplied)
 
 
 27
 Apparently in that case defendant did not give notice as required by the contract. Nevertheless, the Minnesota Supreme Court limited recovery to the loss of profits for the 30-day notice period because 'defendant had the right to cancel the contract by giving 30 days' notice'. Here the contracts specifically provided, 'this contract may be cancelled by either party on the second anniversary hereof * * *', by making full payment of all indebtedness. A 30-day notice of intention to exercise the right of full payment was provided in the notes. We construe Pappas v. Stark to mean that Minnesota follows the rule stated in 25 C.J.S. Damages § 74, page 567 (quoted by Judge Joyce):
 
 
 28
 'Where a contract is terminable at any time on notice and it is terminated without notice, the damages which the aggrieved party may recover are limited to the notice period.'
 
 
 29
 Even if there be inconsistency between Swanson v. Andrus and Pappas v. Stark, and we see none, the latter, being the more recent pronouncement of the Supreme Court of Minnesota, would be adopted as indicating the Minnesota rule. Yoder v. Nu-Enamel Corp., 8 Cir., 1941, 117 F.2d 488, 490. We fail to see, then, where a breach prior to the second anniversary could have had any effect on the continuation of Kemp's option to cancel, especially when Western had made provision in the contracts for liquidated damages if Kemp failed each year to purchase the amount specified or at least his requirements. The provision was presumably meant to cover the exact situation that did occur.
 
 
 30
 As to the other cases cited by Western, even if they were not distinguishable, we point out they are not controlling as they do not represent Minnesota law.
 
 
 31
 Western's second claim is that the contracts were not properly cancelled by the defendant Kemp so as to limit his liability. Kemp had two requirements to fulfill in order to cancel-- give notice and to fully pay all indebtedness due. Western claims that the notice was 'conditional', therefore defective, and that all indebtedness was not paid inasmuch as Kemp had not paid what was due under the liquidated damage provision. The letter of cancellation provided:
 
 
 32
 '* * * you are hereby notified that if your allegations pertaining to responsibility by reason of any sales agreements between you and the undersigned Orval L. Kemp, including those hereinbefore specifically mentioned, are held valid, that any and all of such alleged contracts are cancelled in accordance with the provisions thereof, concurrently with the payment of said note and on June 30, 1955.'
 
 
 33
 At the time specified, the indebtedness was paid. We find nothing conditional or ambiguous. There can be no doubt as to Kemp's intention to consider the contract at an end and Western could not have been misled by the letter sent to them. Notice of termination is to be liberally construed, the true intent and purpose of the parties in the ordinary rules of trade being kept in mind. 17 C.J.S. Contracts § 402, page 892.
 
 
 34
 As to Kemp's failure to pay liquidated damages at the time of cancellation, the trial court has correctly analyzed the situation as follows:
 
 
 35
 'However, plaintiff has presented to the Court for the first time the suggestion that Kemp, doing business as Webb Oil Company of Duluth, was not in a position to terminate the purchase agreements of June 23, 1953, because he had not on the second anniversary date paid 'all indebtedness of every kind, nature and description owed by him to the seller.' It is pointed out that, in order to cancel the purchase agreements, Kemp would have had to pay not only the mortgage indebtedness owing by him to Western, but the balance due Western under the liquidated damage clauses of the agreements as well.
 
 
 36
 'On the second anniversary date, Kemp and the other defendants were being sued by Western for specific performance of the contract and a suit for an injunction sought to enjoin each of the defendants from violating the terms of the purchase agreements. In the event equitable relief was denied damages were requested. Plaintiff never has recognized the applicability of the liquidated damage clause with respect to its suit for damages herein and has at all times claimed damages in the amount of some $183,000. Obviously, therefore, a tender of damages to Western by Kemp under the liquidated damage clauses would have been a futile and idle gesture. To suggest, therefore, that Kemp, in order to terminate the purchase agreements on the second anniversary date had to go through the empty ceremony of making a tender of damages under the liquidated damage clauses in light of the undisputed circumstances, seems wholly devoid of any real substance.'
 
 
 37
 In Minnesota a tender is unnecessary where it would be an idle ceremony, Country Club Oil Co. v. Lee, 1953, 239 Minn. 148, 58 N.W.2d 247, 251; Ibs v. Hartford Life Ins. Co., 1913, 121 Minn. 310, 141 N.W. 289, 292; Morgan v. Ibberson, 1943, 215 Minn. 293, 10 N.W.2d 222; 52 Am.Jur., Tender, § 4, page 416.
 
 
 38
 Western's next contention is that the defense of cancellation is personal to Kemp and therefore cannot be used as a defense by the parties who induced the breach. Western cites in support of its contention Royal Realty Co. v. Levin, 1955, 244 Minn. 288, 69 N.W.2d 667, and Bitzke v. Folger, 1939, 231 Wis. 513, 286 N.W. 36. Those cases hold that the defense of the statute of frauds is personal to the parties to the contract. We do not find them controlling here. Western's argument here presupposes that Superior and Webb Oil acted in a way to cause additional damage to Western. As the trial court pointed out, the only damages Western sustained by reason of the wrong were those resulting from Kemp's failure to purchase his requirements. The trial court stated:
 
 
 39
 '* * * on this record plaintiff has no complaint if it is limited to the liquidated damages stipulated in the contract. Realistically considered, damages computed upon that basis represent the proximate result of defendant's wrong whether by reason of breach of contract or tortious conduct.'
 
 
 40
 To allow recovery for the additional years of the contracts against Superior and Webb Oil on the basis that they could not avail themselves of Kemp's defense of cancellation and payment of indebtedness would be to allow future damages not sustained. The trial court correctly stated the controlling Minnesota authorities as follows:
 
 
 41
 'The damages for which Webb and Superior are liable for their wrongful acts are those damages which are the natural and proximate consequence of their acts. Johnson vs. Gustafson, 201 Minn. 629, 277 N.W. 252; Swaney vs. Crawley, 133 Minn. 57, 157 N.W. 910. No special damages are pleaded. No good reason is suggested why the Court should attempt to resort to a different formula for its computation of the damages resulting from the acts of Superior and Webb. The damages which resulted as the natural and proximate consequence of the interference by these defendants with the plaintiff's contract rights are the same as the damages which resulted to plaintiff as a result of Kemp's act of breaching the contract. This view seems entirely consistent with the expression of the Minnesota Supreme Court in Swaney vs. Crawley, supra, wherein the court stated, 133 Minn. at page 60, 157 N.W. at page 911:
 
 
 42
 "The general rule, applicable alike to actions in tort and for a breach of contract, limits the injured party to such damages as are the natural and proximate consequence of the wrongful act of the defendant. North vs. Johnson, 58 Minn. 242, 59 N.W. 1012. The injury must be the immediate and not merely the remote consequence of the wrong, whether a breach of contract or wilful tort. 13 Cyc. 25. In the case at bar, one in tort, the injury suffered by plaintiffs in consequence of the wrongful act of defendant in causing Dowdall to break his contract with them, was the loss of the benefits secured by the contract, and they are entitled to recover such damages, and such damages only, as resulted naturally and proximately from that loss. In such an action it has been held, and the ruling seems sound in principle, that the injured party is limited, as a general rule, to such damages as might have been recovered for a breach of the contract itself."
 
 
 43
 We agree with the trial court that Superior and Webb Oil are not liable for damages beyond the period expressed in Kemp's option to cancel.
 
 
 44
 Western's final point is that the measure of damages against the parties inducing the breach, Superior and Webb Oil, is the profits loss and is not to be limited to the liquidated damage provisions of the contracts up to the date of cancellation. Western cites Twitchell v. Glenwood-Inglewood Co., 1915, 131 Minn. 375, 155 N.W. 621, as authority for the proposition that the right to present and prospective damages is vested in one who has suffered wrongful conduct. In that case, the Minnesota Supreme Court stated at page 625 of 155 N.W.:
 
 
 45
 'Plaintiff, immediately upon the interruption and breaking up of her contract with Nelson, became vested with the right to recover such damages, present and prospective, as she suffered in consequence of defendants' wrongful conduct. Kalkhoff v. Nelson, 60 Minn. 284, 62 N.W. 332; 1 Sutherland on Damages, § 131. The lease and contract broken, extended for a period of 10 years, with an agreed rental of $1,200 per year after the second year, and plaintiff's claim of damages was inseparable, and recoverable in one action; in such cases successive actions cannot be maintained.'
 
 
 46
 In the Twitchell case there was no termination clause and no provision for liquidated damages. The law of that case should be properly confined to the type of contract under consideration. There a ten-year lease was interfered with and the court held that it was proper to allow prospective damages over all of the remaining period of the lease. The contract here is entirely different. Here there is a cancellation provision and a stipulation for liquidated damages.
 
 
 47
 A party recovering damages for breach of contract should not be better off because of the breach than he would have been had there been no breach. He is entitled to recover '* * * such damages as are the natural and proximate consequences of the wrongful act of the defendant'. Swaney v. Crawley, 1916, 133 Minn. 57, 60, 157 N.W. 910, 911. The trial court found 'the damages which resulted as the natural and proximate consequence of the interference by these defendants with the plaintiff's contract rights are the same as the damages which resulted to plaintiff as the result of Kemp's act of breaching the contract'. To use a different measurement as to the parties inducing the breach would appear to violate the Minnesota rule as expressed in Swaney v. Crawley, supra, wherein the Minnesota court said that the rule as to natural and proximate damages is '* * * applicable alike to actions in tort and for breach of contract'. In Swaney v. Crawley, supra, a tort case, the Minnesota court said:
 
 
 48
 '* * * the injured party is limited as a general rule to such damages as might have been recovered for a breach of the contract itself.' (Emphasis supplied.)
 
 
 49
 In holding that the provision for liquidated damages contained in the contracts was controlling as between Western and Kemp, the trial court quoted from In the Matter of Grodnik's, Inc., D.C.Minn., 1955, 128 F.Supp. 941, 942:
 
 
 50
 'Provisions in a contract providing for liquidated damages in event of default are prima facie valid, Blunt v. Egeland, 1908, 104 Minn. 351, 116 N.W. 653, and will be declared invalid only when the damages stipulated bear no reasonable relationship to the amount of actual injury suffered by the breach. Stanton v. McHugh, 1941, 209 Minn. 458, 296 N.W. 521; Goodell v. Accumulative Income Corp., 1932, 185 Minn. 213, 240 N.W. 534; Blunt v. Egeland, supra.'
 
 
 51
 See also Meuwissen v. H. E. Westerman Lumber Co., 1944, 218 Minn. 477, 16 N.W.2d 546, 549-550. The trial court, after pointing out that the provisions of the contracts for liquidated damages were prima facie valid and that the court could not say that they bore no reasonable relation to the actual injury sustained by reason of the breach, that Superior and Webb Oil were liable only for those damages which were the natural and proximate consequences of their acts (citing Johnson v. Gustafson, 1938, 201 Minn. 629, 277 N.W. 252, and Swaney v. Crawley, 1916, 133 Minn. 57, 157 N.W. 910), referred to the fact that no special damages were pleaded and extra costs 'not made to appear'. We find no contradiction between Twitchell v. Glenwood-Inglewood Co., supra, relied on by Western, and Johnson v. Gustafson and Swaney v. Crawley, supra, cited by the trial court. In addition thereto, the cases relied on by the trial court were determined subsequently to Twitchell v. Glenwood-Inglewood Co.
 
 
 52
 The most that can be said for plaintiff on this appeal is that it has raised questions of Minnesota law which are not free from doubt. In dealing with such questions, we will accept the considered views of the District Judge unless clearly persuaded that they are erroneous. See Western Cas. & Surety Co. v. Coleman, 8 Cir., 1950, 186 F.2d 40, 43; Russell v. Turner, 8 Cir., 1945, 148 F.2d 562, 564; Buder v. Becker, 8 Cir., 1950, 185 F.2d 311, 315.
 
 
 53
 This case is in all things affirmed.
 
 
 54
 A true copy.
 
 
 
 [1]
 'Order
 Branch Office
 Shreveport, La.
 Telephone Lincoln 8411
 Western Oil And Fuel Company
 
 
 [227]
 Colfax Avenue North
 Minneapolis, Minn.
 Orval L. Kemp dba Webb Oil
 Company of Duluth, Buyer,
 enters the following order with Western
 Oil and Fuel Company, Seller
 Seller's Sale No. 3196 Buyer's Purchase No. Date June 26, 1953
 Commodity
 Housebrand Gasoline
 Quantity
 3,500,000 gallons per year for a period of seven years beginning with July 1, 1953, and ending with June 30, 1960. Should the purchases of the buyer from seller represent his entire requirements of the products listed and yet not equal the above quantity, such total quantity purchased shall be considered as meeting above quantity.
 Price
 Seller's posted price as posted at seller's office at 227 Colfax Ave. North, Minneapolis, Minnesota.
 F.O.B.
 Buyers' Bulk plants, service stations, or seller's terminal at Wrenshall, Minnesota at buyer's option.
 Terms:
 1% 10 days based on the low quotation of the Midwest Edition of the Wall Street Journal for regular gasoline F.O.B. group 3 (Northern movement).
 Ship to
 As designated by buyers.
 Destination
 Routing
 Shipment
 In equal quantities per month beginning with July 1, 1953 and ending with June 30, 1960. Seasonal demands may effect monthly deliveries, but will not affect yearly quantities. Minimum shipments 3,000 gallons; excess freight charges accruing from failure to meet published tariff minimum weights shall be for account of buyer.
 Remarks:
 This contract may be cancelled by either party on the second anniversary hereof or on any subsequent anniversary provided buyer has paid all indebtedness of every kind nature and description owed by him to seller.
 This order becomes a binding contract when executed by one of Seller's officers at its principal branch office in Minneapolis, Minnesota. The terms and conditions contained on this and the reverse side hereof constitute all the terms of such contract, and any oral or written understandings additional to or at variance with such terms and conditions are absolutely void and of no effect.
 Accepted at Minneapolis, Minnesota, July 3, 1953 Webb Oil Company of Duluth, Buyer, By Orval L. Kemp. Western Oil & Fuel Company (Seller) By T. B. Murphy. Title V P
 Buyer will retain duplicate
 All remittances to be made in Minneapolis Exchange or equivalent.
 Buyer agrees that Seller, in case Buyer fails to buy and accept delivery each year of the quantity of petroleum products specified in said contracts, may cause judgment to be entered as liquidated damages against Buyer in an amount equal to the difference between the quantities in such contracts specified and the amounts actually delivered multiplied by 1/4cents per gallon, together with interest, costs and reasonable attorney's fees; and said Buyer hereby waives stay of execution, exemption laws, errors and appeals, and for that purpose, Buyer hereby appoints any attorney of any court of record as his lawful attorney to appear for and confess judgment against said Buyer. Time is of the essence of this contract. If Buyer purchases all of his requirements of products covered by this contract from Seller, then this clause is of no force and effect.)'