**ARIS GLOVES, INC.**
v.
**UNITED STATES.**
**C.D. 2185, Protest No. 187094–K.**

United States Customs Court,
First Division.
June 9, 1960.

Wilson, J., dissented.

---

Mary Rehan, Brooks & Brooks, New York City, Associate Counsel (Thomas J. McKenna, New York City, of counsel), for plaintiff.

George Cochran Doub, Asst. Atty. Gen. (Richard E. FitzGibbon, Trial Atty., New York City), for defendant.

Before OLIVER, MOLLISON, and WILSON, Judges.

MOLLISON, Judge.

The plaintiff in this case imported into the United States certain women's leather gloves, under 12 inches in length, unlined, and not trimmed with fur, partly hand and partly machine seamed, and not overseamed, on which the collector took duty at the rate of 35 per centum ad valorem under the provisions of paragraph 1532(a), Tariff Act of 1930, 19 U.S.C.A. § 1001, par. 1532(a), as modified by the Presidential proclamation relating to the Torquay Protocol to the General

Agreement on Tariffs and Trade, T.D. 52739.

The protest claim is for duty at the rate of 25 per centum ad valorem under the provisions of paragraph 1532(a), supra, as modified by the Presidential proclamation relating to the General Agreement on Tariffs and Trade, T.D. 51802. It is the plaintiff's contention that the duty increase provided by the Torquay protocol and the Presidential proclamation relating thereto on leather gloves of the kind here involved was a nullity because a condition precedent to the lawful negotiation of a trade agreement with respect to such duty was not complied with. The condition precedent referred to is that required by section 4 of the Trade Agreements Act of 1934, as amended (19 U.S.C.A. § 1354), and paragraph 5 of Executive Order No. 10082 (14 F.R. 6105), 19 U.S.C.A. § 1351 note, with respect to the giving of reasonable public notice to interested parties of an opportunity to present their views to the Committee for Reciprocity Information, the agency designated by the President to receive such views, concerning the articles or products as to which it was proposed to conduct trade agreement negotiations.

An account of the background of the situation presented by the present case may be helpful in understanding the matter.

As originally enacted, paragraph 1532 (a) of the Tariff Act of 1930 provided for certain duties in addition to the basic duties therein prescribed on gloves "When machine seamed, otherwise than overseamed," and "when seamed by hand." The duties with respect to women's gloves, when seamed by hand, were reduced by the Presidential proclamation relating to the French Trade Agreement, T.D. 48316, and those with respect to gloves, when machine seamed, were reduced by the Presidential proclamation relating to the Czechoslovakian Trade Agreement, T.D. 49458.

Litigation arose as to the status of gloves, partly seamed by hand and partly machine seamed, and, in the case of

United States v. Aris Gloves, Inc., 31 CCPA 169, C.A.D. 268, it was held that if a glove had not first been made into a completed glove by one or the other types of seaming, i. e., where part of the seaming which made the article into a glove was by hand and the other part was by machine, the provisions of neither trade agreement modification applied, and such gloves were held to be properly classifiable under the provisions in paragraph 1532(a), supra, as unmodified, and dutiable only according to the basic duty applicable thereto, without the additional duties imposed by reason of hand or machine seaming.

Although there were some changes in language and rates, essentially the same tariff situation as to women's leather gloves, seamed partly by hand and partly by machine, obtained upon the proclamation by the President relating to the General Agreement on Tariffs and Trade, T.D. 51802, and the provisions of paragraph 1532(a), as modified by that proclamation under which the plaintiff in this case claims, read as follows:

| Tariff Act of 1930, paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 1532(a) | Gloves made wholly or in chief value of leather, whether wholly or partly manufactured:<br><br>*     *     *     *     *<br><br>Women's and children's gloves not over twelve inches in length .................. | $5 per doz. pairs |
| | *     *     *     *     *<br><br>*Provided further*, That the foregoing shall be dutiable at not less than the following rates:<br><br>*     *     *     *     *<br><br>If women's or children's gloves:<br><br>*     *     *     *     *<br><br>Other [than machine seamed or hand seamed] .. | 25% ad val. |

Prior to the importation of the gloves involved in this case, the United States entered into negotiations with the Governments which were contracting parties to the General Agreement on Tariffs and Trade, and other Governments, as the result of which the agreement known as the Torquay Protocol to the General Agreement on Tariffs and Trade was entered into. Part I of schedule XX annexed to the said protocol contains a list of the items relating to United States import duties as to which agreement had been made.

■ With respect to the items covered by paragraph 1532(a) of the Tariff Act of 1930, schedule XX of the Torquay protocol reads as follows:

| Tariff Act of 1930, paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 1532(a) [part] (Geneva) | Gloves made wholly or in chief value of leather, whether wholly or partly manufactured: <br> * * * * * <br> *Provided further,* That the foregoing shall be dutiable at not less than the following rates: <br> * * * * * <br> If women's or children's gloves: <br> * * * * * <br> Other .............. | Withdrawn |
| 1532(a) | Gloves made wholly or in chief value of leather, whether wholly or partly manufactured, if women's or children's (except machine seamed gloves, not lined, and not trimmed with fur, and except hand seamed gloves, not lined, and not trimmed with fur), shall be dutiable at not less than the following rates: <br> Seamed in part by hand and in part by machine, not lined, and not trimmed with fur: <br> Not over 12 inches long .. <br> Over 12 inches long .... <br> Other ..................... | <br><br><br><br><br><br><br><br><br><br> 35% ad val. <br> 30% ad val. <br> 25% ad val. |

By Presidential Proclamation No. 2929, of June 2, 1951 (reported in T.D. 52739), the President of the United States proclaimed that his earlier proclamation relating to the General Agreement on Tariffs and Trade (reported in T.D. 51802), was thereby terminated to the extent that, among other things, "items 1532(a) [part] (Geneva) and 1532(a), respectively" in part I of schedule XX annexed to the Torquay protocol, and hereinbefore quoted, should be applied, effective on and after July 6, 1951, with the modifications provided for in the said items as contained in the said schedule XX annexed to the Torquay protocol.

Section 4 of the Trade Agreements Act of 1934 (48 Stat. 943, as amended, 63 Stat. 698; 19 U.S.C.A. § 1354), as in force and effect at the time of the negotiation of the Torquay protocol, provided in part as follows:

"Before any foreign trade agreement is concluded with any foreign

government or instrumentality thereof under the provisions of this Act, reasonable public notice of the intention to negotiate an agreement with such government or instrumentality shall be given in order that any interested person may have an opportunity to present his views to the President, or to such agency as the President may designate, under such rules and regulations as the President may prescribe; * * * ."

Paragraphs 4 and 5 of Executive Order No. 10082, promulgated by the President under the foregoing authority, read as follows:

"4. Before entering into the negotiation of a proposed trade agreement under the Trade Agreements Act, as amended the Trade Agreements Committee shall submit to the President for his approval a list of all articles imported into the United States which it is proposed should be considered in such negotiations for possible modification of duties and other import restrictions, imposition of additional import restrictions, or specific continuance of existing customs or excise treatment. Upon approval by the President of any such list, as originally submitted or in amended form, the Trade Agreements Committee shall cause notice of intention to negotiate such agreement, together with such list of articles, to be published in the Federal Register. Such notice and list shall also be issued to the press, and sufficient copies shall be furnished to the Committee for Reciprocity Information for use in connection with such hearings as the Committee may hold with respect thereto. Such notice, together with the list or a statement as to its availability, shall also be published in the *Department of State Bulletin, Treasury Decisions,* and the *Foreign Commerce Weekly.*

"5. Any interested person desiring to present his views with respect to any article in any list referred to in paragraph 4 hereof, or with respect to any other aspect of a proposed trade agreement, may present such views to the Committee for Reciprocity Information, which shall accord reasonable opportunity for the presentation of such views."

In an action involving a different importation of gloves of the same description as those here involved, the present plaintiff brought into issue the validity of the provisions of the Torquay protocol and the Presidential proclamation relating thereto as to such gloves on the ground that publication of the notice required by section 4 of the Trade Agreements Act, supra, was not made in accordance with the manner prescribed in paragraph 4 of Executive Order No. 10082, supra, which, it was claimed, constituted mandatory rules and regulations prescribed by the President under authority of said section 4 governing, among other things, the organs or media by which such public notice was to be given.

In its decision, reported as Aris Gloves, Inc. v. United States, 154 F.Supp. 203, 38 Cust.Ct. 131, C.D. 1854, a majority of this division of this court held that the provisions of paragraph 4 of Executive Order No. 10082 with respect to the manner and means of publication of the notice of intention to negotiate were not mandatory, inasmuch as it was held that the clause in section 4 of the Trade Agreements Act, as amended, supra, "under such rules and regulations as the President may prescribe" did not modify the clause "reasonable public notice of the intention to negotiate an agreement," but only the clause providing for "an opportunity to present his views to the President, or to such agency as the President may designate," and, further, that, in the absence of contrary statutory provision, the publication which was effected by the notice in the Federal Register was sufficient to comply with the requirement for "reasonable public notice," citing section 8 of the Federal Register Act (44 U.S.C.A. § 308, 49 Stat. 502), as authority therefor.

This decision was affirmed on appeal in Aris Gloves, Inc. v. United States, 281 F.2d 954, 46 CCPA 41, C.A.D. 693.

In the present suit, the plaintiff does not raise any question with respect to the regularity of the notice caused to be published by the Interdepartmental Committee on Trade Agreements of the intention to enter into trade agreement negotiations, but it does contend that the notice or announcement as to the scope of the hearings to be held, issued and caused to be published by the Committee for Reciprocity Information, pursuant to section 4 of the Trade Agreements Act, supra, and paragraph 5 of Executive Order No. 10082, was insufficient to constitute reasonable public notice so that any interested person might have an opportunity to present his views to the said Committee.

The notice of intention to conduct trade agreement negotiations given by the Interdepartmental Committee on Trade Agreements was published in 15 F.R. 2114. So far as pertinent, it reads as follows:

"Pursuant to Section 4 of the Trade Agreements Act, approved June 12, 1934, as amended (48 Stat. 945, ch. 474, Public Law 307, 81st Cong.) and to paragraph 4 of Executive Order 10082 of October 5, 1949 (14 F.R. 6105), notice is hereby given by the Interdepartmental Committee on Trade Agreements of intention to conduct trade-agreement negotiations with the following countries * * *. It is proposed to enter into negotiations with these countries for the purpose of negotiating mutually advantageous tariff concessions. * * *

"There is annexed hereto a list of articles imported into the United States to be considered for possible modification of duties and other import restrictions, imposition of additional import restrictions, or specific continuance of existing customs or excise treatment in proposed trade agreement negotiations with the above countries.

* * * * * *

"No article will be considered in the negotiations for possible modification of duties or other import restrictions, imposition of additional import restrictions, or specific continuance of existing customs or excise treatment unless it is included, specifically or by reference, in the annexed list or unless it is subsequently included in a supplementary public list. No duty or import tax imposed under a paragraph or section of the Tariff Act or Internal Revenue Code other than the paragraph or section listed with respect to such article will be considered for a possible decrease, although an additional or separate duty on an article included in the annexed list which is imposed under a paragraph or section other than that listed may be bound against increase as an assurance that the concession under the listed paragraph or section will not be nullified.

* * * * * *

"Pursuant to Section 4 of the Trade Agreements Act, as amended, and paragraph 5 of Executive Order 10082 of October 5, 1949, information and views as to any aspect of the proposals announced in this notice may be submitted to the Committee for Reciprocity Information in accordance with the announcement of this date issued by that Committee."

In the list of articles referred to in the foregoing excerpt, there appears the following:

SCHEDULE 15. SUNDRIES

* * * * * *

Para.

1532   (a) Gloves made wholly or in chief value of leather, whether wholly or partly manufactured, including glove tranks, with or without the usual accompanying pieces.

The notice issued by the Committee for Reciprocity Information, referred to

in the last paragraph quoted from the notice of intention to conduct trade agreement negotiations, was published in 15 F.R. 2128, and reads as follows:

"COMMITTEE FOR RECIPROCITY
INFORMATION

"Trade-Agreement Negotiations With Each of the Following Countries:

"I. Australia, Belgium, Brazil, Canada, France, Luxemburg, New Zealand, the Netherlands, Norway, the Union of South Africa, and the United Kingdom, which are contracting parties to the General Agreement on Tariffs and Trade; and

"II. Austria, the Federal Republic of Germany, Guatemala, Korea, Peru, and Turkey, which are applicants for accession to the General Agreement on Tariffs and Trade; and

"III. Possible Adjustment in Preferential Rates on Cuban Products.

Submission of Information to the Committee for Reciprocity Information

Closing date for application to be heard, May 10, 1950

Closing date for submission of briefs, May 17, 1950

Public hearings open, May 24, 1950

"The Interdepartmental Committee on Trade Agreements has issued on this day a notice of intention to conduct trade-agreement negotiations with the following countries including in each case areas in respect of which the country has authority to conduct trade-agreement negotiations: Australia, Austria, Belgium, Brazil, Canada, France, the Federal Republic of Germany, Guatemala, Korea, Luxemburg, New Zealand, the Netherlands, Norway, Peru, Turkey, the Union of South Africa, and the United Kingdom. Annexed to this public notice is a list of articles imported into the United States to be considered for possible concessions in the negotiations.

"The notice of intention to negotiate states that it is proposed to enter into negotiations with these countries for the purpose of negotiating mutually advantageous tariff concessions. Negotiations with Austria, the Federal Republic of Germany, Guatemala, Korea, Peru, and Turkey will also be for the purpose of their accession to the General Agreement on Tariffs and Trade.

"The Interdepartmental Committee on Trade Agreements has also announced in such notice that, in the case of each article in the list with respect to which the corresponding product of Cuba is subject to preferential treatment, the negotiations referred to will involve the elimination, reduction, or continuation of the preference, perhaps with an adjustment or specification of the rate applicable to the product of Cuba. It has also been announced by the Interdepartmental Committee on Trade Agreements that consideration might be given proposals to change the date in Article XXVIII of the General Agreement on Tariffs and Trade.

"The Committee for Reciprocity Information hereby gives notice that all applications for oral presentation of views in regard to the foregoing proposals, which must indicate the product or products on which the individuals or groups desire to be heard, shall be submitted to the Committee for Reciprocity Information not later than 12:00 noon, May 10, 1950, and all information and views in writing in regard to the foregoing proposals shall be submitted to the Committee for

Reciprocity Information not later than 12:00 noon, May 17, 1950.

"Such communications shall be addressed to 'The Chairman, Committee for Reciprocity Information, Tariff Commission Building, Washington, 25, D. C.' Ten copies of written statements, either typed, printed, or duplicated shall be submitted, of which one copy shall be sworn to.

"Public hearings will be held before the Committee for Reciprocity Information, at which oral statements will be heard. The first hearing will be at 10:00 a. m. on May 24, 1950, in the Hearing Room in the Tariff Commission Building, 7th and E Streets, N. W., Washington, 25, D. C. Witnesses who make application to be heard will be advised regarding the time and place of their individual appearances. Appearances at hearings before the Committee may be made only by or on behalf of those persons who have filed written statements and who have within the time prescribed made written application for oral presentation of views. Statements made at the public hearings shall be under oath.

"Persons or groups interested in import products may present to the Committee their views concerning possible tariff concessions by the United States on any product, whether or not included in the list annexed to the notice of intention to negotiate. However, as indicated in the notice of intention to negotiate, no tariff reduction will be considered on any product which is not included in the list annexed thereto or in a supplementary public list.

"Persons interested in export items may present their views regarding any tariff (including preferential tariff) or other concessions that might be requested of the foreign governments with which negotiations are to be conducted.

"Views concerning general provisions of a nature customarily included in trade agreements may also be presented.

"Copies of the list attached to the notice of intention to negotiate may be obtained from the Committee for Reciprocity Information at the address designated above and may be inspected at the field offices of the Department of Commerce. The United States Tariff Commission has this date issued a notice stating the location and availability of tariff and commodity information pertinent to the pending negotiations announced herein.

"By direction of the Committee for Reciprocity Information this 11th day of April, 1950."

The plaintiff contends that the foregoing notice limited the scope of the oral or written presentations of views to tariff *concessions* on the listed products, and the term "concessions," it contends, both from a reading of the notice itself and from specific statements made in a statement issued the following day by the Interdepartmental Committee on Trade Agreements (Department of State Publication 3819, Commercial Policy Series 126), refers to *reductions* in duty on the products listed or *bindings* of duty-free or specified dutiable status, and does not encompass duty *increases*.

The statements pointed to by the plaintiff are the following:

"The tariff concessions on specific products which may be negotiated under the General Agreement are of various types. They may be reductions in specified rates of customs duty, or "bindings" of such rates— a guarantee not to increase them during the life of the agreement. Likewise, a concession may consist of the binding of the duty-free status of an article—a guarantee not to impose a tariff on the article if it is being admitted duty free at the time the agreement is concluded. * * *"

At the trial of the issue, plaintiff sought to offer documentary evidence tending to show that the only response relating to the articles covered by paragraph 1532(a), supra, drawn by the notice issued by the Committee for Reciprocity Information of the hearings to be held was from groups interested in duty reductions, and it was contended that such evidence corroborated the viewpoint of the plaintiff that the notice, on its face, was limited to duty reductions. Objection was made on behalf of the defendant that such evidence was immaterial, which objection was sustained with leave to pursue the matter further in the briefs to be filed by the parties.

We have examined the arguments and authorities cited by the plaintiff in the brief filed in its behalf concerning the admissibility of the documents offered by it. In view of the conclusion we have reached, however, from an examination of the pertinent statute and Executive order, as well as the notices which were issued and caused to be published by the Interdepartmental Committee on Trade Agreements and the Committee for Reciprocity Information, we do not deem it necessary at this time to reverse the ruling made on the trial of the issue.

In our opinion, neither of the notices referred to, nor both considered together, were, on their face, sufficient to constitute the "reasonable public notice of the intention to negotiate an agreement * * * in order that any interested person may have an opportunity to present his views to the President, or to such agency as the President may designate" called for by section 4 of the Trade Agreements Act, as amended, supra, and by the substantially similar language of paragraphs 4 and 5 of Executive Order No. 10082, supra.

The scope of the proposed negotiations, and of the hearings to be held in connection therewith, is fixed by the statement made at the beginning of each notice that "It is proposed to enter into negotiations with these countries for the purpose of negotiating *mutually advanta-*

*geous tariff concessions*" [italics added]. While the italicized language is not itself specific as to precisely what the proposed purpose of the negotiations was to be, it is sufficiently definite to establish that *increases* in rates of United States import duties were not under consideration, for the only logical meaning that can be ascribed to the language is that one country, e. g., country A, would propose or make a concession as to its own tariff which would be advantageous to another country or countries, e. g., countries B, etc., in return for a concession in the tariff or tariffs of the other country or countries (countries B, etc.) which would be advantageous to it (country A). Such advantage could only be a reduction, or at the most, a binding of duties or other import restrictions, since an increase in import duties imposed by one country would obviously be *disadvantageous* with respect to any other country or countries.

Webster's New International Dictionary, second edition, 1945, defines "concession" as

"1. Act of conceding or yielding; —usually implying a demand, claim, or request, and thus distinguished from *giving*, which is voluntary or spontaneous; as, adjusted by mutual *concessions.*

\* \* \* \* \* \*

"3. A thing yielded; an acknowledgment or admission; a boon; a grant. Specif., *Com.*, a reduction from a current price of a commodity."

The connotation of *reduction* or *abatement* is carried into the understanding of the term in law. See "concession" in Black's Law Dictionary, third edition, and United States v. P. Koenig Coal Co., D.C., 1 F.2d 738, 740.

Having thus established the scope of the proposed negotiations and of the hearings to be held thereon as relating to reductions or abatements of duties, that scope was not broadened, contrary to defendant's contention, by the statement in the second full paragraph of the notice issued and caused to be published

by the Interdepartmental Committee on Trade Agreements referring to the annexed list of articles—

"* * * to be considered for possible modification of duties and other import restrictions, imposition of additional import restrictions, or specific continuance of existing customs or excise treatment * * *."

This language is substantially the same as that contained in section 350(a)(1)(B) of the Tariff Act of 1930 (the Trade Agreements Act) (19 U.S.C.A. § 1351), establishing the limits of the power of the President by proclamation to effect such changes in tariff treatment of imports as might be necessary to carry out trade agreements entered into under the Trade Agreements Act. If anything, the addition, as above, of such language introduced an element of confusion and uncertainty into the notice, since it is obviously in conflict with the purpose stated in the preceding paragraph for which it was proposed to enter into trade agreement negotiations, i. e., to negotiate mutually advantageous tariff concessions.

"A notice must be clear, definite, and explicit, and not ambiguous." 66 C.J.S. Notice § 16, page 654, and cases cited in the notes thereto. And this has been the test applied in the case of statutes relating to the tariff where, as here, "reasonable public notice" has been required to be given as a prerequisite to the exercise by the President of the power to change tariff rates. The so-called flexible tariff provisions of the Tariff Act of 1930 involve procedures not unlike those involved in the Trade Agreements Act, including the giving of "reasonable public notice" of hearings to afford reasonable opportunity for parties interested to be heard. Concerning such notice, our appellate court, in Carl Zeiss, Inc. v. United States, 76 F.2d 412, 417, 23 CCPA 7, 14, T.D. 47654, said that the Tariff Commission—

"* * * is certainly required to be sufficiently definite in its notices of its hearings, as to fairly, adequately, and reasonably acquaint interested parties with the purpose and scope of its investigations; otherwise the statute would be circumvented, and, as a consequence, importers, American industries, and the general public might be deprived of their statutory rights."

In that case, as here, it appeared that the scope of the hearings, and of the resulting proclamation, was not confined to the matters contained in the public notice, and it was held that inasmuch as the President, when exercising the powers granted in the flexible tariff provisions, is the agent of the Congress, he could not validly act unless all of the prerequisites to the exercise of that power laid down by the statute, including the giving of "reasonable public notice" of hearings, had been met.

Subsequent to the decision of the Zeiss case, supra, other cases were decided by our appellate court on the issue of the sufficiency of notices relating to hearings in tariff matters, and, in each case, distinction was made between the facts in the Zeiss case, and those in the other cases. Our appellate court pointed out in each of the subsequent cases that the facts in the Zeiss case, as they do here, showed that the notice issued and published was not sufficient to indicate the scope and extent of the hearings as they actually developed, the result of which formed the basis for subsequent Presidential action. See Lord & Taylor v. United States, 26 CCPA 151, C.A.D. 9; Westergaard Berg-Johnsen Co. v. United States, 27 CCPA 207, C.A.D. 86; and S. Handal & Sons, Inc. v. United States, 30 CCPA 61, C.A.D. 215.

We are satisfied that, insofar as they relate to leather gloves classifiable under paragraph 1532(a), supra, the notice of intention to negotiate, caused to be issued and published by the Interdepartmental Committee on Trade Agreements, and the notice of hearings to be held, caused to be issued and published by the Committee for Reciprocity Information, were insufficient in fact and in law to constitute the "reasonable public notice" required by the statute and the pertinent

regulations to be given. It follows, as plaintiff here contends, that one of the conditions imposed by Congress when constituting the President its agent in the Trade Agreements Act, supra, was not fulfilled, and, consequently, insofar as in Proclamation No. 2929, relating to the Torquay protocol, reported in T.D. 52739, the President proclaimed that:

"The said proclamation of December 16, 1947 [relating to the General Agreement on Tariffs and Trade], specified in the second recital of this proclamation, as amended and rectified, and the said proclamations supplemental thereto referred to in the second recital of this proclamation are hereby terminated to the extent that each of items * * * 1532(a) in Part I of Schedule XX (original) of the said General Agreement specified in the first recital of this proclamation, effective on and after July 6, 1951, shall be applied with the modifications provided for in * * items 1532(a) [part] (Geneva) and 1532(a), respectively, in Part I of Schedule XX contained in Annex A to the said Torquay Protocol specified in the fifth recital of this proclamation."

the said proclamation was without authority of law, illegal, and void (Carl Zeiss, Inc. v. United States, supra, and cases therein cited), and the assessment of duty on the gloves here in issue was likewise without authority of law, illegal, and void.

There being no question as to the classification of the gloves in issue, they are properly assessable with duty at the appropriate rate according to value under paragraph 1532(a), as modified only by the Presidential proclamation relating to the General Agreement on Tariffs and Trade, T.D. 51802. Judgment will issue accordingly.

WILSON, Judge (dissenting).

I regret that I find it necessary to dissent from the majority opinion in this case. The conclusions reached in the prevailing opinion are not, I believe, supported by either the facts or the law.

The facts in the case are not in dispute. As set forth in the majority opinion, certain women's leather gloves were assessed by the collector with duty at the rate of 35 per centum ad valorem under paragraph 1532(a) of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739. The claim of the plaintiff is for duty at the rate of 25 per centum ad valorem under the provisions of paragraph 1532(a) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802.

The plaintiff's position is that the duty increase set forth in the Torquay protocol making effective the rate increase on leather gloves, such as those involved in this case, was null and void because the notice given of intention to negotiate certain changes in tariff rates, including those upon the type of merchandise here involved, was not "reasonable public notice" to the interested parties, as provided and intended under the provisions of section 4 of the Trade Agreements Act of 1934, as amended, and paragraph 5 of Executive Order No. 10082.

It is conceded, as it must be, that the notice given to interested parties in the form in which it was given was duly and legally given so far as its form and method of publication are concerned. This point has already been adjudicated in a case involving the exact type of merchandise now again before the court. Aris Gloves, Inc. v. United States, 154 F. Supp. 203, 38 Cust.Ct. 131, C.D. 1854, affirmed on appeal in Aris Gloves, Inc. v. United States, 281 F.2d 954, 46 CCPA 41, C.A.D. 693. It is also admitted that the merchandise now before the court was adequately described in the notice as given. The only contention of the plaintiff is, therefore, that while the notice was duly and legally published, and while it properly described the merchandise in which the plaintiff is interested, the said notice was defective in that it did not adequately set forth the

scope of the hearings to be conducted by the Committee for Reciprocity Information and was, therefore, insufficient to constitute reasonable public notice so that any interested person might have an opportunity to present his views to the said committee. In my opinion, the whole matter of reasonable notice was settled by our appellate court in the Aris Gloves case, supra, for, in that case, the court held, at page 43, that "The sole issue to be decided here, as it was below, is whether 'reasonable public notice of the intention to negotiate' the Torquay protocol was given, as required by statute." The court held that such notice was given.

Section 4 of the Trade Agreements Act of 1934 (48 Stat. 943, as amended, 63 Stat. 698; 19 U.S.C.A. § 1354), prescribing that notice must be given prior to the conclusion of a trade agreement, reads as follows:

"Before any foreign trade agreement is concluded with any foreign government or instrumentality thereof under the provisions of this Act, reasonable public notice of the intention to negotiate an agreement with such government or instrumentality shall be given in order that any interested person may have an opportunity to present his views to the President, or to such agency as the President may designate, under such rules and regulations as the President may prescribe; * * * ."

The President's Executive Order No. 10082, paragraphs 4 and 5, issued by authority of the foregoing congressional enactment, reads as follows:

"4. Before entering into the negotiation of a proposed trade agreement under the Trade Agreements Act, as amended, the Trade Agreements Committee shall submit to the President for his approval a list of all articles imported into the United States which it is proposed should be considered in such negotiations for *possible modification of duties* and other import restrictions, imposition of additional import re-

strictions, *or specific continuance of existing customs or excise treatment.* Upon approval by the President of any such list, as originally submitted or in amended form, the Trade Agreements Committee shall cause notice of intention to negotiate such agreement, together with such list of articles, to be published in the FEDERAL REGISTER. * * *

"5. Any interested person desiring to present his views with respect to any article in any list referred to in paragraph 4 hereof, or with respect to any other aspect of a proposed trade agreement, may present such views to the Committee for Reciprocity Information, which shall accord reasonable opportunity for the presentation of such views. [Italics ours.]"

A reading of the foregoing paragraph from the Trade Agreements Act of 1934 and paragraphs 4 and 5 of Executive Order No. 10082 indicates that the whole controversy in this case must be resolved by determining whether or not the contents of the notice given by the Interdepartmental Committee on Trade Agreements satisfies the requirements for a "reasonable public notice of the intention to negotiate an agreement," as set forth in section 4 of the Trade Agreements Act of 1934.

The notice in question so far as applicable herein, reads as follows:

"Pursuant to Section 4 of the Trade Agreements Act, approved June 12, 1934, as amended (48 Stat. 945, ch. 474, Public Law 307, 81st Cong.) and to paragraph 4 of Executive Order 10082 of October 5, 1949 (14 F.R. 6105), notice is hereby given by the Interdepartmental Committee on Trade Agreements of intention to conduct trade-agreement negotiations with the following countries * * *. It is proposed to enter into negotiations with these countries for the purpose of negotiating mutually advantageous tariff concessions. * * *

"There is annexed hereto a list of articles imported into the United States to be considered for possible modification of duties and other import restrictions, imposition of additional import restrictions, or specific continuance of existing customs or excise treatment in proposed trade agreement negotiations with the above countries.

\*   \*   \*   \*   \*   \*

"No article will be considered in the negotiations for possible modification of duties or other import restrictions, imposition of additional import restrictions, or specific continuance of existing customs or excise treatment unless it is included, specifically or by reference, in the annexed list or unless it is subsequently included in a supplementary public list. No duty or import tax imposed under a paragraph or section of the Tariff Act or Internal Revenue Code other than the paragraph or section listed with respect to such article will be considered for a possible decrease, although an additional or separate duty on an article included in the annexed list which is imposed under a paragraph or section other than that listed may be bound against increase as an assurance that the concession under the listed paragraph or section will not be nullified.

\*   \*   \*   \*   \*   \*

"Pursuant to Section 4 of the Trade Agreements Act, as amended, and paragraph 5 of Executive Order 10082 of October 5, 1949, information and views as to any aspect of the proposals announced in this notice may be submitted to the Committee for Reciprocity Information in accordance with the announcement of this date issued by that Committee."

In my opinion, the foregoing notice, if read as a whole, which it must be, clearly advised all interested parties that in the negotiation of the proposed agreement both tariff reductions and tariff ad-vances would be considered. To reach any other conclusion requires that the second paragraph of the notice stating "There is annexed hereto a list of articles imported into the United States to be considered for possible modification of duties and other import restrictions, imposition of additional import restrictions, or specific continuance of existing customs or excise treatment" must be completely ignored. Clearly, in determining the meaning and effect of a notice, its whole contents must be considered. One of the primary rules of statutory construction is that the entire contents of a statute must be considered and effect given to all the language contained therein, if possible. Nestle's Food Co. (Inc.) v. United States, 16 Ct.Cust. Appls. 451, T.D. 43199; Cassard Romano Co., David A. Haagens v. United States, 19 CCPA 191, T.D. 45294. The notices such as those here under consideration should be likewise so construed.

"Reasonable notice" is defined in 66 C.J.S. Notice § 8, page 642, as follows:

" 'Reasonable notice' is defined to be such notice or information of a fact as may fairly and properly be expected or required in the particular circumstances."

In support of the foregoing statement, C.J.S. cites the case of Sterling Mfg. Co. v. Hough, 49 Neb. 618, 68 N.W. 1019, which, in turn, cites Black's Law Dictionary. Can it be said that the notice under attack did not impart "information of a fact" such as might "fairly and properly be expected or required in the particular circumstances"? Black's Law Dictionary, fourth edition, under the heading of "Notice," makes the following statement:

"Knowledge of facts which would naturally lead an honest and prudent person to make inquiry constitutes 'notice' of everything which such inquiry pursued in good faith would disclose. Twitchell v. Nelson, 131 Minn. 375, 155 N.W. 621, 624; German-American Nat. Bank of Lincoln v. Martin, 277 Ill. 629, 115 N.E. 721, 729.

"In another sense 'notice' means information, an advice, or written warning, in more or less formal shape, intended to apprise a person of some proceeding in which his interests are involved, or informing him of some fact which it is his right to know and the duty of the notifying party to communicate."

In my opinion, the notice in question properly advised the plaintiff herein that merchandise of the type now before the court would be considered in certain tariff negotiations not only for the purpose of arriving at desirable concessions, but also for the purpose of "possible modification of duties and other import restrictions, imposition of additional import restrictions, or specific continuance of existing customs or excise treatment."

In the case of Baker v. Baker, Mo. App., 274 S.W.2d 322, 323, it was pointed out that the "Requirement of reasonable notice is flexible and pliable, not rigid and unyielding," and that "Reasonable notice is such notice or information of a fact as may fairly and properly be expected or required in the particular circumstances."

In the case of In re Hansen's Guardianship, 229 Iowa 914, 295 N.W. 429, it was held that:

"A notice is sufficient, even though conflicting statements are made therein, if there is no reasonable ground for believing that the defendant was misled to his prejudice."

While the immediate effect of the majority opinion is to hold only that the Torquay agreement is invalid, insofar as it changes the duty rate on merchandise of the type in which the plaintiff is now interested (women's leather gloves of a certain kind), yet, the practical effect of the decision is to throw into question the whole agreement as to all merchandise upon which tariff rates were increased. Surely, such results should be anticipated, and a holding such as that set forth in the majority opinion should not be promulgated except upon more substantial grounds than those set forth in the prevailing opinion. I am well aware of the fact that the court may adjudicate the question of the validity of such agreements and of the notices given prior to the negotiation of such agreements. However, I am of the opinion that the notice here given would be adequate under any circumstance to apprise the parties involved of the extent of the negotiations contemplated, to say nothing of the applicability of the reasoning to the international reciprocal trade agreements, which have been in effect for some 26 years, and under which a great volume of international trade has been conducted.

The majority opinion relies on the case of Carl Zeiss, Inc. v. United States, 76 F.2d 412, 23 CCPA 7, T.D. 47654, as its authority in reaching the conclusion that the notice in the instant case and the Presidential proclamation were void. However, that case is clearly distinguishable and is not controlling in the instant case. In the Zeiss case, supra, the merchandise consisted of a prism binocular, 6 by 24, the figure "6" indicating a magnification by 6 times, and the figure "24" indicating the diameter of the lens in millimeters. The merchandise, imported from Germany, was appraised in New York at the American selling price, as provided in section 402(g) of the Tariff Act of 1930, 19 U.S.C.A. § 1402, in accordance with a Presidential proclamation, dated December 14, 1932 (62 Treas. Dec. 674), issued under authority of section 336 of the said act, 19 U.S.C.A. § 1336. In its appeal to reappraisement, the importer claimed that the involved merchandise, which it was conceded was dutiable under paragraph 228(a) of the Tariff Act of 1930 at 60 per centum ad valorem, should have been appraised at its foreign or export value, whichever was higher, rather than upon the basis of American selling price. In this connection, appellant, in the Zeiss case, supra, contended that a notice published by the Tariff Commission relative to its investigation authorized under section 336, supra, was not a valid and legal

notice of the investigation, because, it was claimed, the Commission did not confine its investigation within the limits of the published notice. Section 336 authorizes and directs the Tariff Commission, under certain conditions, to investigate cost of production in the United States and abroad, and, in connection with the investigation, or investigations, to conduct hearings after giving "reasonable public notice thereof." After its investigation, the Commission was required to make recommendations to the President, who is authorized to proclaim new rates.

Paragraph 228(a), supra, provides for "prism binoculars, * * * frames and mountings therefor, and parts * * *" and for many other instruments. Subsection (b) of that paragraph also provides for many instruments including "opera or field glasses (not prism binoculars), telescopes, microscopes * * *."

The Senate of the United States adopted Senate Resolution 219 directing the Tariff Commission to investigate by authority of section 336 of the Tariff Act of 1930 the difference in the cost of production in the United States and abroad of optical instruments, as described in paragraph 228(a) and (b) of the act. Later, Senate Resolution 219 was rescinded by that body, and Senate Resolution 227 was adopted directing that the investigation cover "Optical instruments of a class or type used by the Army, Navy, or air force for fire control and parts thereof."

From the foregoing resolutions, it is obvious that the Senate, in vacating the original resolution (219) directing an investigation covering all optical instruments, as described in paragraph 228(a) and (b), supra, and adopting a restricted resolution (227), limiting the investigation to optical instruments of a class or type used by the Army, Navy, or Air Force for fire control or parts thereof, had specifically in mind limiting the scope of the investigation to be made. Nevertheless, the investigating body proceeded to extend its investigation to include optical instruments *"suitable for use"* by the Army, Navy, and Air Force. [Italics added.] The court found that "optical instruments of a class or type used by the Army, Navy, or Air Force for fire control" and optical instruments, suitable for use by the Army, Navy, and Air Force, referred to entirely different types of merchandise and that, therefore, a notice of investigation of optical instruments of the first class gave no notice of an investigation concerning optical instruments constituting an entirely different type of merchandise, to wit, optical instruments suitable to be used by the Armed Forces. The court, in the Zeiss case, supra, accordingly held that the proclamation of the President with respect to optical instruments *"used by* the Army, Navy, or their respective Air Forces for fire control" was without authority of law, illegal, and void. In the instant case, it is conceded that the merchandise in which the plaintiff is interested was properly described, so it is difficult to understand the application of the Zeiss case, supra, to the facts of the present case. Indeed, it is not only not controlling but is not applicable to the facts now before us.

Inasmuch as it is conceded and has been adjudicated that due legal notice was given in this case, and that the merchandise in which plaintiff is interested was properly described in said notice, and that part of said notice imparted the information that the articles described would be considered for "possible modification of duties and other import restrictions, imposition of additional import restrictions, or specific continuance of existing customs or excise treatment," I am of the opinion that the notice given under all the circumstances constituted reasonable public notice to the plaintiff, as contemplated by section 4 of the Trade Agreements Act of 1934 and paragraphs 4 and 5 of Executive Order 10082. I am, therefore, of the opinion that the plaintiff's protest should be overruled and the classification and assessment of the merchandise by the collector ordered to stand.